UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARDSTARTER, LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>SUNDAESWAP, INC., et al.,<br><br>    Defendants. | Case No. 22-cv-00757-RS<br><br>**ORDER DENYING MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |

**I. INTRODUCTION**

This case involves a scandal within the cryptocurrency community. In the process of supporting the launch of a new cryptocurrency exchange, Plaintiff CardStarter, Ltd. ("CardStarter"), avers that Defendant SundaeSwap Labs, Inc., and a number of its corporate officers (collectively, "SundaeSwap"), executed a bait-and-switch: after promising millions of crypto tokens to CardStarter in exchange for supporting SundaeSwap, Defendants reneged on their offer at the eleventh hour. Not only that, CardStarter avers that SundaeSwap violated a separate contractual promise by supporting one of CardStarter's competitors. Plaintiff filed its First Amended Complaint ("FAC") in May 2022, raising five claims for relief averring, among other things, breach of contract and fraud. Defendants move to dismiss the FAC in its entirety. Pursuant to Civil Local Rule 7-1(b), this motion is suitable for disposition without oral argument. After reviewing the parties' briefs, Defendants' motion is denied. The "sham pleading" doctrine does not bar the FAC, and Plaintiff has more than sufficiently stated each of its claims for relief.

## II. BACKGROUND[1]

Founded in 2021, CardStarter describes itself as "a launch pad, accelerator, and incubator for blockchain projects." Dkt. 30 ("FAC") ¶ 40. In particular, CardStarter has focused its efforts on supporting cryptocurrency projects running on the Cardano blockchain,[2] and in April 2021, it announced it was planning to release "CardSwap," a decentralized cryptocurrency exchange — or "DEX" — that would allow Cardano users to "swap one cryptocurrency for another."[3] *Id.* ¶ 33. Shortly thereafter, SundaeSwap announced it, too, was planning to develop a DEX on Cardano. CardStarter believed having two competing DEXs would be detrimental both for Cardano users and for each company. This is because a critical component to the success of a DEX is its access to deep "liquidity pools," which are "the backbone of any DEX" and allow them to operate efficiently.[4] *Id.* ¶ 36. CardStarter had access to deep liquidity pools, both ones it controlled outright and that its community members provided; SundaeSwap, meanwhile, had slim to none.

In June 2021, CardStarter approached SundaeSwap to discuss building a combined DEX together. This would avoid "splitting the user base, liquidity pools, and development efforts across two competing platforms." *Id.* ¶ 45. By the end of the month, the parties had entered into a Collaboration and Marketing Agreement ("CMA"), which provided, among other things, that

---

[1] The factual background is based on the averments in the FAC, which must be taken as true for purposes of this motion, and documents of which the Court may take judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[2] Cardano is a "third-generation" blockchain, following "first-generation" blockchain Bitcoin and "second-generation" blockchain Ethereum. FAC ¶ 31.

[3] In the same way that a traditional foreign currency exchange allows people or entities to exchange, for example, U.S. dollars, euros, and British pounds, a DEX allows users to exchange "all cryptocurrencies and tokens that run on [a given] blockchain." FAC ¶ 33.

[4] A liquidity pool is a supply of crypto tokens which can be utilized by the DEX to facilitate exchanges between users. CardStarter analogizes a liquidity pool to "a basket containing two kinds of fruits in a barter trading system; taking one of these fruits requires you to replace them with an equal value of the other fruit. The basket in this analogy is the liquidity pool." FAC ¶ 36. Liquidity pools are not owned by the DEX, but rather are provided by separate users, typically in exchange for a reward of crypto tokens offered by the DEX. *See id.* ¶ 37. CardStarter states that the total value of the relevant liquidity pools here was roughly $25–26 million between June 2021 and January 2022, and that this valuation was publicly available. *See id.* ¶ 75(e).

CardStarter would provide its technical expertise to the development of SundaeSwap's DEX, as well as any liquidity pools it had access to *after* the launch of the DEX (but, importantly, not those pools it already had access to). SundaeSwap, in turn, agreed to give CardStarter's own cryptocurrency preferred status on the SundaeSwap DEX and agreed not to "support, collaborate with, advise, develop or market products or services similar to the CardStarter launchpad business model" for the first year after the DEX's launch. *Id.* ¶ 52(e).[5]

In addition to the CMA, the parties separately discussed a "Gentleman's Agreement," under which CardStarter would transfer its *existing* liquidity pools to the SundaeSwap DEX and would encourage its community members to do the same with their liquidity pools. SundaeSwap, in return, would give CardStarter 150 million SUNDAE tokens, i.e., 7.5% of the total supply of 2 billion tokens of SundaeSwap's own cryptocurrency, for "further distribution to CardStarter's community." *Id.* ¶ 5. Critically, the Gentleman's Agreement was never formalized in the same way the CMA had been. SundaeSwap refused to put the deal in writing, insisting that doing so could cause regulatory problems for SundaeSwap with the Securities and Exchange Commission. Throughout the summer and fall of 2021, CardStarter sought assurances from SundaeSwap that it would honor its end of the Gentleman's Agreement — otherwise, "community scandal" would ensue. *Id.* ¶ 60. SundaeSwap repeatedly confirmed that the deal was still on. Given these reassurances, CardStarter continued to offer its support and encouraged its community members to transfer their liquidity pools irrevocably to the SundaeSwap DEX beginning in November 2021.

On the eve of the DEX's official launch in January 2022, CardStarter received a bombshell message from SundaeSwap: rather than the 150 million tokens contemplated by the Gentleman's Agreement, SundaeSwap now proposed transferring only 10 million tokens to CardStarter. Incredulous, CardStarter sought confirmation that the deal had indeed been altered; SundaeSwap's

---

[5] While Defendants seek judicial notice of the CMA, *see* Dkt. 41-1, their request will be treated instead as seeking incorporation by reference and granted in that respect only. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (noting that a defendant may seek to incorporate by reference a document into the complaint if the plaintiff refers extensively to the document).

Chief Operating Officer, Defendant Artem Wright, responded: "Yes, that's correct. We feel that [10 million] is the fair amount for what [liquidity] is available today." *Id.* ¶ 77. In the aftermath of this revelation, the CardStarter community — furious they were being undercut after irrevocably transferring their liquidity pools to the DEX — erupted; some users made death threats against CardStarter officers. *See id.* ¶ 102. A few months later, SundaeSwap also began to collaborate with Cardashift, another "community-run launchpad . . . built upon the Cardano blockchain." *Id.* ¶ 116.

CardStarter filed suit against SundaeSwap and several of its officers in February 2022. The operative FAC raises five claims for relief: (1) breach of contract for the Gentleman's Agreement; (2) promissory estoppel; (3) fraud; (4) breach of contract for the CMA; and (5) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, and the California False Advertising Law ("FAL"), *id.* § 17500. It seeks compensatory and punitive damages, specific enforcement, injunctive and declaratory relief, as well as attorneys' fees and costs. Defendants move to dismiss the FAC in its entirety.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party*." Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

For actions sounding in fraud, the complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Such averments "must be

accompanied by 'the who, what, when, where, and how' of the misconduct charged," such that they are "specific enough to give defendants notice of the particular misconduct." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (first quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); and then quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). Knowledge may be pleaded generally under Rule 9(b), but the complaint "must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018).

### IV. DISCUSSION

#### A. "Sham Pleading" Doctrine

Defendants first move to dismiss by arguing that the FAC is a "sham pleading" and must be discarded. Under this doctrine, which Defendants recognize is an "extreme remedy," plaintiffs may be barred from changing their factual allegations in an amended complaint "for the purposes of avoiding dismissal." Dkt. 41 ("Mot."), at 6 (citing *JPMorgan Chase Bank, N.A. v. Ward*, 245 Cal. Rptr. 3d 303, 313 (Ct. App. 2019)). Substantively, Defendants argue Plaintiff altered or omitted certain facts in the FAC and thus impermissibly "chang[ed] its narrative." Dkt. 47, at 4 & tbl. Plaintiff counters that this doctrine is simply unavailable in the Ninth Circuit.

Putting aside the fact that Plaintiff's original Complaint was never scrutinized under a motion to dismiss, as well as the somewhat hair-splitting nature of Defendants' objections to the differences between the original Complaint and the FAC, Plaintiff offers the better reading of Ninth Circuit precedent. Granted, there is support for both parties' contentions. *Compare, e.g.*, *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) ("A party cannot amend pleadings to 'directly contradic[t] an earlier assertion made in the same proceeding.'" (alteration in original) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990))), *with Allen v. City of Arcata*, 691 Fed. App'x 461, 463 (9th Cir. 2017) ("[N]othing in the Federal Rules of Civil Procedure prohibits inconsistent pleadings."). However, the most persuasive holding, and the one most consistently applied by district courts in this circuit, comes

from *PAE Government Services, Inc. v. MPRI, Inc.* 514 F.3d 856 (9th Cir. 2007). The panel there rejected the "sham pleading" doctrine, writing:

> At the time a complaint is filed, the parties are often uncertain about the facts and the law; and yet, prompt filing is encouraged and often required . . . . As the litigation progresses, and each party learns more about its case and that of its opponents, some allegations fall by the wayside as legally or factually unsupported. This rarely means that those allegations were brought in bad faith or that the pleading that contained them was a sham. Parties usually abandon claims because, over the passage of time and through diligent work, they have learned more about the available evidence and viable legal theories, and wish to shape their allegations to conform to these newly discovered realities. We do not call this process sham pleading; we call it litigation.

*Id.* at 859. Courts following *PAE* have maintained that the "sham pleading" doctrine is not available for defendants to raise on a motion to dismiss. *See Kanaan v. Yaqub*, 2022 WL 3357834, at *4 (N.D. Cal. Aug. 15, 2022) (discussing split in authority, citing cases, and concluding *PAE* and its progeny offer clearer precedent). Thus, in the absence of clearer direction from the Ninth Circuit, the FAC will not be dismissed under the "sham pleading" doctrine.

### B. Factual Sufficiency of the Claims

Moving past their "sham pleading" argument, Defendants next attack the factual sufficiency of each of Plaintiff's claims. It is clear, however, that Plaintiff has more than satisfied its obligation to prove it has a "plausible" case based on the facts it presents — which, again, must be taken as true for the purposes of this motion. *See Knievel*, 393 F.3d at 1072.

Defendants first argue that Plaintiff has not adequately pled that the Gentleman's Agreement was breached; indeed, they dispute the existence of an enforceable contract at all. Multiple times, Defendants characterize Plaintiff's averments on this point as "absurd," "vague," or "remarkable." Mot. 1, 10–11. Yet their arguments amount to either factual disagreements or affirmative defenses — for instance, that the contract was not a "signed writing" such that a breach could be enforced. *Id.* at 10. While these arguments may be valid at a later point in litigation, they are unconvincing on a motion to dismiss. Plaintiff has stated a plausible, even convincing claim that the Gentleman's Agreement was an enforceable contract with reasonably

certain terms, that Defendants breached this contract, and that Plaintiff was injured as a result.[6] The fact the parties knew how to form a written contract, as evidenced by the CMA, does not undermine the averment that the Gentleman's Agreement was a valid contract: according to Plaintiff, Defendants specifically insisted on *not* forming a written contract. The motion is therefore denied as to the first breach of contract claim.

Defendants' argument that Plaintiff has failed to state a claim for promissory estoppel is similarly unavailing. The most salient term of the Gentleman's Agreement — tokens for liquidity pools — is certainly "clear and definite" enough to support the claim that a promise was made. Whether that promise was in fact a firm agreement, as Plaintiff claims, or a promise to continue negotiating, as Defendants argue, is a factual question. Defendants' argument that Plaintiff's averred reliance was "unreasonable as a matter of law," *id.* at 12, is an unwarranted stretch. Finally, Defendants argue that the promissory estoppel claim cannot succeed as it is not supported by the balance of equities — indeed, that "[a] clearer example of inequity is difficult to imagine." *Id.* at 13. Contrary to this assertion, it is quite easy to imagine an inequity much starker than the one Defendants claim is present here. Plaintiff has adequately pleaded a case for promissory estoppel.

Third, Plaintiff's fraud claim is stated not just sufficiently but in almost painstaking detail. Rather than being "devoid of a single . . . actionable misrepresentation," *id.* at 14, the FAC is replete with averred misleading statements, along with the dates on which they were conveyed, the media used to transmit them, and the identities of those Defendants making the statements.

---

[6] The parties disagree as to which state's law controls: the CMA includes a Wyoming choice-of-law provision, while the averred breach of the Gentleman's Agreement occurred in California. *See* Mot. 9 & n.5; Dkt. 44, at 10–11. This issue need not be resolved at the motion to dismiss stage, and Plaintiff's averments would, in any event, satisfy either test. *Compare CSAA Ins. Exch. v. Hodroj*, 287 Cal. Rptr. 3d 264, 267 (Ct. App. 2021) (establishing breach of contract elements as (1) "a contract was formed," (2) "the plaintiff did everything required by the contract," (3) "the defendant did not do something required by the contract," and (4) "the plaintiff was harmed as a result"), *with Kappes v. Rhodes*, 512 P.3d 31, 36 (Wyo. 2022) (establishing breach of contract elements as "(1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of [the] injured party to damages" (alteration in original) (quotation marks omitted)).

1    Defendants again attempt to dispute the factual basis of these claims and urge these statements

2    should be construed as "equivocal and hypothetical statements during the negotiation process,"

3    and to argue that Plaintiff's reliance would be unreasonable as a matter of law. *Id.* Whatever value

4    these arguments might have goes to the merits of the case — not as a basis for a motion to dismiss.

5    The motion is thus denied as to Plaintiff's fraud claim.

6    Plaintiff has also sufficiently stated a claim for breach of the CMA. Defendants argue that

7    the FAC "lacks particularity" on this point, largely restating the *Twombly* and *Iqbal* pleading

8    standard. Once again, their argument turns on the merits of the case and interpretation of what the

9    CMA did and did not permit SundaeSwap to do with respect to CardStarter's competitors. This

10   argument is similarly inappropriate to resolve on a motion to dismiss, and Defendants offer no

11   further support for why Plaintiff's claim is insufficiently pleaded. The motion is thus denied as to

12   Plaintiff's second breach of contract claim.

13   Finally, Defendants argue that Plaintiff cannot assert a claim under the UCL nor the FAL.

14   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.

15   Code § 17200. "Because the statute is written in the disjunctive, . . . [e]ach prong of the UCL is a

16   separate and distinct theory of liability[.]" *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718,

17   731 (9th Cir. 2007). The FAL similarly prohibits any "unfair, deceptive, untrue, or misleading

18   advertising." Cal. Bus. & Prof. Code § 17500; *see Williams v. Gerber Prods. Co.*, 552 F.3d 934,

19   938 (9th Cir. 2008). Once again Defendants' arguments are off base. As stated above, Plaintiff has

20   adequately stated a claim for breach of contract; this averred violation of a common law duty is

21   alone sufficient to serve as the "predicate for stating a cause of action under the UCL's unlawful

22   prong." *Berryman v. Merit Pro. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 185 (Ct. App. 2007). Likewise,

23   as stated above, Plaintiff has already stated a claim for common law fraud, the elements of which

24   are more stringent than those under the UCL; it has, therefore, *ipso facto* stated a claim under the

25   UCL's fraudulent prong and the FAL. *See In re Tobacco II Cases*, 207 P.3d 20, 29–30 (Cal. 2009)

26   (clarifying the difference between common law fraud and UCL fraud claims); *Shaeffer v. Califia

27   Farms, LLC*, 258 Cal. Rptr. 3d 270, 277 (Ct. App. 2020) (noting FAL and UCL fraudulent prong

28

claims "substantively overlap" such that plaintiff's burden is the same under both).[7] Plaintiff's claim under the unfair prong, while not developed in detail, is nonetheless sufficient to survive Defendants' motion "[r]egardless of the test used to assess unfairness." *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1156 (S.D. Cal. 2021). Contrary to Defendants' assertion, Plaintiff has also adequately asserted injury, and thus has standing under both the FAL and the UCL; and it lacks a remedy at law for the injunctive relief it validly seeks, which justifies proceeding under the UCL. Defendants' motion is therefore denied as to Plaintiff's UCL and FAL claims.

## V. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss the FAC is denied.

**IT IS SO ORDERED**.

Dated: October 5, 2022

_____
RICHARD SEEBORG
Chief United States District Judge

---

[7] Defendants do not challenge the sufficiency of Plaintiff's pleadings under the FAL.