**BRYAN CAVE LEIGHTON PAISNER LLP**
Eric Martin, California Bar No. 330534
Meryl Macklin, California Bar No. 115053
Helen C. Goodman, California Bar No. 324725
Sasha D. Riedisser, *pro hac vice*
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070
Telephone: (415) 675-3400
Facsimile: (415) 675-3434
Email: eric.martin@bclplaw.com; macklin@bclplaw.com;
helen.goodman@bclplaw.com; sasha.riedisser@bclplaw.com

*Attorneys for Counterclaimant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CARDSTARTER LABS, LTD., <br><br>        Plaintiff, <br><br>    v. <br><br> SUNDAESWAP LABS, INC., *et al.*, <br><br>        Defendants. | Case No. 3:22-cv-00757-RS <br><br> **DEFENDANTS' COUNTERCLAIMS** <br><br> Judge:   Hon. Richard Seeborg <br><br> DEMAND FOR JURY TRIAL |

# COUNTERCLAIMS

Counterclaimant SundaeSwap Labs, Inc. ("SundaeSwap") states and alleges as follows in support of its counterclaims against Plaintiff/Counterclaim Defendant CardStarter Labs, Ltd. ("CardStarter"). SundaeSwap and CardStarter will jointly be referred to as the "Parties."

## JURISDICTION AND VENUE

1. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over CardStarter because these Counterclaims are compulsory counterclaims in the action filed by CardStarter and are so related to CardStarter's claims that they form part of the same case or controversy.

2. Venue is proper in this Court because a substantial part of the events giving rise to these Counterclaims occurred in this District. 28 U.S.C. § 1391(b)(3).

## PARTIES

3. Upon information and belief, CardStarter is a British Virgin Islands Business Company with its principal place of business outside the United States.

4. SundaeSwap is a Wyoming corporation with its principal place of business in Greenbrae, California.

## FACTS COMMON TO ALL COUNTS

### I. Background on SundaeSwap's DEX

5. A DEX is a decentralized cryptocurrency exchange. It is a digital location where an individual can exchange one type of cryptocurrency (for example, Bitcoin) for another (for example, Ethereum) without an intermediary.

6. Liquidity pools, or liquidity, are the cryptocurrency or tokens available for exchange on a DEX. If there is not enough of a certain cryptocurrency or token, exchanges may be stalled for DEX users.

7.     The Total Value Locked or "TVL" of a DEX is the combined value of the liquidity pools within a particular DEX.

8.     A blockchain is a decentralized, public ledger of cryptocurrency transactions.

9.     Cardano is a third-generation blockchain noted for its transactional efficiency, relatively low environmental footprint, and peer-reviewed secure technology.

10.    SundaeSwap is a native, scalable decentralized exchange ("DEX") and automated liquidity provision protocol.

11.    SundaeSwap announced its intention to launch a DEX on the Cardano blockchain in early 2021.

12.    The SundaeSwap DEX provides liquidity and created a market for others to exchange their Cardano-native tokens. In return, the users of the DEX, or the swappers, pay a small fee and liquidity providers earn a return on their deposits to liquidity pools.

13.    SundaeSwap's white paper, "SundaeSwap Fundamentals," is attached hereto as Exhibit 1 and provides further context regarding how SundaeSwap's DEX operates.

**II.    CardStarter Needs a DEX**

14.    CardStarter announced publicly, on April 24, 2021, "We are proud to announce that CardStarter … will be releasing … a [DEX] built on the Cardano network …"

15.    On June 12, 2021, CardStarter announced, "The CardSwap team has been developing a DEX for Cardano, it's going to be sleek, it's going to be intuitive, and it's well ahead of the curve."

16. In reliance on those announcements, CardStarter's community and investors gave CardStarter much-needed capital.

17. Upon information and belief, CardStarter outsourced the creation of its DEX to contractors based in India, but those contractors were not able to create a DEX for CardStarter.

18. CardStarter made virtually no progress toward creating its DEX prior to June 2021.

19. Upon information and belief, CardStarter finished only the user interface design for the DEX by June 2021.

20. In other words, CardStarter did not take even the most basic steps needed to create a DEX, including transferring intellectual property, hiring necessary employees and/or contractors, or creating a bridge for transferring its tokens and liquidity to the Cardano blockchain.

21. Upon information and belief, CardStarter's value was declining rapidly in 2021, but CardStarter was either unable or unwilling to return its investor's funds, even though it could not produce the product it promised its investors—a DEX on the Cardano blockchain.

22. Upon information and belief, CardStarter's investors and community members were rapidly losing patience with CardStarter's lack of evident progress on its DEX and CardStarter's declining value.

### III. CardStarter Approaches SundaeSwap

23. SundaeSwap's presence and reputation on social media far exceeded that of CardStarter.

24. This excitement and interest would be crucial for building a community on the DEX. Without a large and invested community, the DEX would struggle to be a viable exchange of cryptocurrency and tokens.

25. CardStarter was unable to generate the same level of buzz and excitement as SundaeSwap.

26. CardStarter recognized that SundaeSwap would have the first and most significant DEX on the Cardano blockchain.

27. In June of 2021, CardStarter approached SundaeSwap, which had made significant progress toward creating a DEX on Cardano, and requested a collaboration. CardStarter informed SundaeSwap that it had no interest in building a DEX or competing with SundaeSwap.

### IV. The Collaboration and Marketing Agreement

28. CardStarter wanted, from the start, an agreement whereby SundaeSwap would commit to providing tokens to CardStarter in exchange for CardStarter providing SundaeSwap with liquidity when the SundaeSwap DEX launched.

29. CardStarter drafted a proposed deal memorandum setting out what such an agreement could look like.

30. SundaeSwap agreed to negotiate a possible future agreement where it would provide tokens as a reward for liquidity deposited at launch, but at all times made clear that it would not enter into any such agreement prior to the launch of SundaeSwap's DEX.

31. As SundaeSwap explained repeatedly to CardStarter, entering into any such agreement prior to launch would undermine SundaeSwap's efforts to satisfy United States regulators that its token was a utility token under the Securities and Exchange Commission's guidelines.

32. SundaeSwap agreed, however, that the Parties could enter into an agreement to support their collaboration and whereby the Parties would commit to negotiating the terms of a liquidity-at-launch-for-rewards agreement in good faith

in the future. SundaeSwap made clear from the start that although the Parties could continue their discussions about a liquidity-at-launch-for-rewards agreement, it would not enter into any agreement in which it was committed to providing tokens to CardStarter until that token had launched.

33. The Parties executed the Collaboration and Marketing Agreement on June 30, 2021 (the "CMA"). A true and accurate copy of the CMA is attached hereto as Exhibit 2 and incorporated by reference.

34. The CMA is a formal, signed, and integrated agreement that expressly states it is the complete agreement between the Parties and that all prior representations and agreements are superseded by its terms. Exhibit 2 at ¶ 10.

35. The CMA defines the boundaries of the Parties' relationship.

36. The Parties agreed that the CMA "shall be construed in accordance with the laws of the State of Wyoming." Exhibit 2 at ¶ 11.

37. Under the CMA, CardStarter agreed that it would "… [e]ngage in joint public marketing, promotion or social media communications regarding the DEX and SundaeSwap…" Exhibit 2 at ¶ 1.e.

38. The CMA contains a "Relationship of Parties" provision that provides

> Each party is acting only as an independent contractor of the other Party and does not undertake, by this Agreement or otherwise, to perform any obligation of the other Party, whether regulatory or contractual, or to assume any responsibility for the other Party's business or operations. Neither Party shall act or represent itself, directly or by implication, as an agent of the other, or have any power or authority to bind the other Party to any agreement.

Exhibit 2 at ¶ 9 (emphasis added).

39. Notably, nothing in the CMA commits SundaeSwap to provide a certain percentage of its tokens in exchange for liquidity from CardStarter at

launch. There is no commitment for SundaeSwap to provide tokens to CardStarter at all. See generally Exhibit 2.

40. As a compromise, the Parties agreed in the CMA that CardStarter would "[p]rovide to the DEX all total value locked ("TVL") in or from CardStarter projects developed or contributed in the 12 months **after the DEX launch**" in exchange for receiving Most Favored Nation status; and that CardStarter would receive no tokens or rewards of any kind for this promise. Exhibit 2 at ¶¶ 1.c; 2.c; & 4 (emphasis added).

41. The CMA's "future agreement" provision provided that in the future the parties would discuss in good faith entering into one or more investment transactions in SundaeSwap. Exhibit 2 at ¶ 4.

42. The Parties planned that CardStarter would deposit all of its liquidity to liquidity pools on the SundaeSwap DEX at the launch of the DEX, and in exchange the Parties would reward CardStarter liquidity providers with SundaeSwap tokens in proportion to the amount of liquidity actually deposited into liquidity pools.

43. SundaeSwap agreed it would not "support, collaborate with, advise, develop or market products or services similar to the CardStarter Launchpad business model for the 12 months after the DEX launch." Exhibit 2 at ¶ 2.e.

44. The CMA was the result of much negotiation between the Parties.

45. The Parties were represented by counsel in negotiating the terms of the CMA.

46. The Parties are sophisticated and have experience negotiating and entering into contractual obligations.

47. The Parties understand the importance of memorializing their contracts into a formal, written, and signed agreement

## V.  CardStarter's Misrepresentations to SundaeSwap and Bad Faith Negotiations

48. When CardStarter first approached SundaeSwap, it represented that CardStarter controlled between $100 and $200 million that could be deposited into DEX liquidity pools at the time of launch.

49. By the time the Deal Memorandum was provided to SundaeSwap in mid-June 2021, CardStarter's self-valuation had already begun to drop: "CardStarter will provide all locked TVL from CARDSTARTER and CARDSWAP at ADA mainnet (projected to be between $50 million to $100 million)."

50. By July 2021, SundaeSwap realized CardStarter only controlled a portion of its liquidity (but incorrectly believed the value was $20 million).

51. On July 1, 2021, with approval from CardStarter, SundaeSwap announced its collaboration with CardStarter to its community via its website.

52. Based on CardStarter's representations to SundaeSwap regarding the liquidity under its control, SundaeSwap announced that the Parties were in the process of negotiating for CardStarter to provide $57,000,000 in TVL at SundaeSwap's launch.

53. SundaeSwap did not represent that CardStarter's community members would receive SundaeSwap's tokens in exchange for CardStarter's TVL at launch.

54. Nor did SundaeSwap represent that the Parties reached a firm commitment that CardStarter would receive 7.5% of SundaeSwap's tokens.

55. Indeed, when the Parties were negotiating the terms of such an agreement, it was clear that the amount of tokens SundaeSwap would provide to CardStarter was ultimately dependent on the amount of liquidity that CardStarter-related investors deposited into liquidity pools at the launch of the DEX.

8

56. In fact, even in the deal memorandum, it is clear CardStarter knew that the amount of tokens that liquidity providers could receive from SundaeSwap would be contingent upon the amount of liquidity deposited at launch of the DEX. In that memorandum, SundaeSwap's provision of 7.5% of its tokens was contingent on CardStarter contributing $50 to $100 million in liquidity to SundaeSwap.

57. As CardStarter points out in its pleadings, SundaeSwap repeatedly and publically stated that it had **not** committed to providing any tokens in exchange for liquidity at launch. Complaint[1] at ¶¶ 90-93.

58. Those public statements were true and accurate—there were ongoing negotiations for an exchange of tokens for deposited liquidity, but there never was any promise or contractual obligation that SundaeSwap would provide any tokens to CardStarter (or, for that matter, that CardStarter would provide any liquidity deposits to the DEX).

59. In spite of SundaeSwap's repeated and clear instructions that no agreement relating to token rewards would be entered into prior to the launch of its DEX and that the Parties would not be entering into a merger, CardStarter led its community members to believe otherwise.

60. In spite of SundaeSwap's repeated public admonishments that no agreement had been reached regarding an exchange of SundaeSwap tokens for CardStarter liquidity, CardStarter's community members came to believe that such an agreement had been reached.

61. Upon information and belief, this was because CardStarter told CardStarter's community members that they would receive tokens—apparently without also stating that CardStarter must deposit liquidity to SundaeSwap at

---

[1] CardStarter's first complaint in this action will be referred to as the "Complaint" and its First Amended Complaint as the "FAC."

launch. This is evident from the reaction of CardStarter's community members when they learned that SundaeSwap would not be providing rewards to CardStarter even though no liquidity was deposited at launch of the DEX in January 2022.

62. CardStarter admits that prior to the announcement from SundaeSwap, CardStarter had "been reassuring and encouraging its community about the CardStarter-SundaeSwap partnership, and providing and announcing incentives for community members who agreed to irrevocably commit their own liquidity for migration to SundaeSwap's DEX." FAC at ¶ 113.

63. CardStarter admits that it believed that the discussed reward of tokens was "the incentive for users to add a ton of liquidity and migrate to Sundae or a DEX we choose" and that they emphasized CardStarter's hope of being able to announce the number of tokens available to incentivize the community members. FAC at ¶ 98.

64. CardStarter was desperate to promise its community members a large reward of tokens so that it could scrape together liquidity to contribute to SundaeSwap's DEX and so that it could earn that reward and thereby assuage the rising frustrations of its investors over CardStarter's failure to create a DEX.

65. Because of that desperation, CardStarter told its community members they could expect 7.5% of SundaeSwap's tokens even though the Parties never reached a final agreement regarding the amount of liquidity that would be required to earn any token rewards, and even though SundaeSwap explicitly prohibited CardStarter from announcing that such a rewards-for-liquidity-at-launch agreement had been reached.

66. CardStarter repeatedly threatened SundaeSwap that if it did not provide 7.5% of its tokens to CardStarter, CardStarter's community members would be furious. CardStarter knew that its community members would threaten

the lives and safety of SundaeSwap's principals and used the threat of their ire in an attempt to bully SundaeSwap into committing a large percentage of its tokens in exchange for an indefinite, and ultimately non-existent, amount of deposited liquidity.

67. CardStarter also publicly, and falsely, described its partnership with SundaeSwap as a "merger."

68. For example, in a July ask-me-anything session, Ashwin Somasundaram, CardStarter's senior operations advisor, was asked: "Is this an integration between CSWAP and SundaeSwap? Is it essentially a replacement of CardSwap?" Somasundaram responded: "This is a merger, and Sundae is the name of the main DEX where a lot of this will be taking place." He continued to explain that CardStarter's community would be "very well taken care of by all of us," and that they are getting an "amazing end of this deal."

69. SundaeSwap, however, was clear that the parties would not be engaging in a "merger" and that the collaboration should not be referred to as such.

70. Upon information and belief, CardStarter wanted to represent the collaboration between the Parties as a merger so that it could imply to its investors that it had secured an ownership interest in SundaeSwap's DEX in the form of tokens.

71. Yet, CardStarter continued to evade SundaeSwap's questions about the amount of liquidity under its control.

72. SundaeSwap's CEO, Mateen Motavaf, expressed his frustration to CardStarter on July 23, 2021:

> …Regarding TVL, and this had been the most problematic point for us internally full transparency, is that we were always under the impression until very recently that you guys had control over the entire TVL … So it

was pretty misleading and surprising to learn that you guys only have control of approx 25% of the TVL … There needs to be some level of accountability regarding the deliverables on your end here, as this is where most the value add is coming from…

73. CardStarter did not disclose (and has never disclosed) how much TVL it controlled to SundaeSwap.

74. In fact, in January of 2022, SundaeSwap was still asking CardStarter for an accurate estimate of the amount of liquidity it could provide at launch:

... Since we're closing in on launch, we wanted to get some more concrete numbers on what the expected TVL that will be transferred is going to be. Currently on DeFiLlama, it says that CardStarter has 18m in TVL…

75. At launch of the SundaeSwap DEX, CardStarter controlled less than $10 million in TVL.

76. At all times, the Parties understood that the number of tokens to be provided by SundaeSwap as a reward to CardStarter was contingent on the amount of liquidity deposited by CardStarter at launch. This is evident from the Parties' communications.

77. SundaeSwap negotiated in good faith on January 18, 2022 that if CardStarter and/or its investors could deposit only $10 million in liquidity at launch, that SundaeSwap could agree to a reward of 10 million tokens.

78. CardStarter rejected SundaeSwap's good faith valuation and refused to continue negotiations and did not deposit any liquidity. Instead, it demanded 7.5% of SundaeSwap's token supply no matter whether or how much liquidity CardStarter contributed at launch.

79. Ultimately, it did not matter how SundaeSwap valued CardStarter's available TVL because CardStarter did not provide any liquidity to SundaeSwap at launch.

**VI.   The Collapse of the Collaboration**

80. In the first week of January 2022, SundaeSwap reached out to CardStarter multiple times to discuss an appropriate valuation of CardStarter's TVL.

81. CardStarter rejected SundaeSwap's offer of 10 million tokens in exchange for the deposit of $10 million in liquidity but refused to negotiate in good faith an alternate valuation.

82. SundaeSwap launched its DEX on January 20, 2022. Within approximately a week, it had already realized more than seventy million dollars in TVL without any TVL from CardStarter.

83. On January 23, 2022, after CardStarter failed to negotiate in good faith for a valuation of its liquidity available at launch or even to provide any liquidity at launch, SundaeSwap addressed CardStarter's community members in an attempt to calm their concerns.

84. In that address, SundaeSwap explained that the Parties had attempted to negotiate an agreement where SUNDAE tokens could be earned by CardStarter investors who deposited liquidity to the SundaeSwap DEX but that no such agreement was ever reached.

85. SundaeSwap further explained that there was never a merger between the Parties and that no money, tokens, or anything else of value was paid or promised by any party to the other; SundaeSwap had not yet received anything from CardStarter.

86. On January 23, 2022, CardStarter published, without SundaeSwap's consent, messages reflecting the negotiations between the Parties wholly out of context.

87. CardStarter misrepresented that these messages memorialized a contractual agreement between the Parties whereby SundaeSwap would provide 7.5% of its tokens for whatever indefinite amount of TVL CardStarter could provide at launch.

88. It became quickly evident from their reactions that CardStarter had made misrepresentations to its community members. CardStarter alleged the following:

   a. It received death threats, and its principals were doxed when its community learned CardStarter would not receive Sundae tokens. FAC at ¶ 102.

   b. Within weeks of its community realizing CardStarter would not receive Sundae tokens, the value of CardStarter's token dropped from $9 per unit to $2.60 a unit. FAC at ¶ 112.

89. CardStarter further alleged that they expected "a mutiny if there [were] any less than 7.5% total" provided to CardStarter. FAC at ¶ 12.

90. CardStarter's own community members have also spoken out against CardStarter's misrepresentations about an exchange for SundaeSwap's tokens: "Cardstarter committed fraud today, gave deceitful information and got investors to provide liquidity [to CardStarter] on false information and cheated investors."

91. If CardStarter did not tell its community members they could expect tokens from SundaeSwap, there is no reason the community should have expected to receive them, particularly in light of SundaeSwap's repeated public statements that it had not made any such promise.

92. There is especially no reason CardStarter's community should have expected to receive 7.5% of SundaeSwap's tokens if CardStarter had not told them to expect that exact percentage of tokens.

93. There was never any final agreement regarding a token reward by SundaeSwap to CardStarter. Rather these and other messages were reflections of the Parties' on-going efforts to negotiate the terms of a written agreement that they would execute at a later date.

94. CardStarter instructed and encouraged its angered community members to engage in virtual threats and attacks to SundaeSwap, and its community members did just that.

## CAUSE OF ACTION I
## BREACH OF CMA

95. SundaeSwap incorporates its prior allegations as though set forth herein.

96. The Parties entered into the CMA on June 30, 2021.

97. SundaeSwap fulfilled all of its obligations under the CMA.

98. CardStarter breached the CMA by (a) failing to "discuss in good faith entering into one or more investment transactions in SundaeSwap…" Exhibit 2 at ¶ 4 (the "Future Agreement Provision"); misrepresenting the amount of liquidity it controlled, making it impossible for SundaeSwap to determine an appropriate reward to provide in exchange for the deposit of the liquidity under CardStarter's control because it did not know how much liquidity CardStarter controlled.

99. CardStarter agreed that it would not "act or represent itself, directly or by implication, as … hav[ing] any power or authority to bind [SundaeSwap] to any agreement" (the "Relationship Provision"). Exhibit 2 at ¶ 9.

100. Upon information and belief, CardStarter represented to third parties, including CardStarter's investors and members of its community, that SundaeSwap had committed to providing it (and its community members) 7.5% of the SUNDAE tokens.

101. SundaeSwap has been damaged because it has been unable to consider partnerships that could have provided SundaeSwap with better support and more liquidity at launch and because it has suffered considerable reputational injury as a result of CardStarter's breaches.

102. CardStarter's various breaches of the CMA have directly caused SundaeSwap monetary and reputational harm.

103. CardStarter's breaches also caused SundaeSwap to lose opportunities for collaboration and partnership with other companies.

104. CardStarter's various breaches of the CMA are material breaches under the terms of the CMA because SundaeSwap has fully performed under the CMA, SundaeSwap's reputational injury cannot be adequately compensated through monetary remedy, and CardStarter has received the full benefit of SundaeSwap's obligations under the CMA.

## CAUSE OF ACTION II

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

105. SundaeSwap incorporates its prior allegations as though set forth herein.

106. Implicit in every contract is a duty of good faith and fair dealing.

107. CardStarter breached the covenant of good faith and fair dealing by (a) misrepresenting the amount of liquidity it could deposit to SundaeSwap's DEX at launch; (b) telling its community members the Parties had reached an agreement whereby SundaeSwap had agreed to provide 7.5% of its tokens to CardStarter and

its investors; (c) using the pressure generated by its misinformation to push SundaeSwap into committing to providing 7.5% of its tokens to CardStarter and its investors; (d) interfering with SundaeSwap's ability to effectively negotiate for an exchange of such tokens for deposited liquidity; (e) blaming SundaeSwap for the Parties' failure to reach an agreement by publicly misrepresenting that the Parties had reached such an agreement and that SundaeSwap had reneged on that agreement.

108. CardStarter's breach directly and proximately caused economic and reputational harm to SundaeSwap in an amount that will be determined following full discovery in this matter.

### *Prayer for Relief*

WHEREFORE, SundaeSwap prays for relief as follows:

i. On the first cause of action for breach of contract, an award of compensatory damages in an amount to be proved for damages caused by CardStarter's breach of the CMA; judgment that the breaches by CardStarter of the CMA were material, entitling SundaeSwap to terminate the CMA; an award of costs; and such other relief the Court deems just and proper;

ii. On the second cause of action for breach of the duty of good faith and fair dealing, an award of compensatory damages in an amount to be proved for damages caused by CardStarter's breach of the good faith and fair dealing; an award of costs; and such other relief the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Counterclaimant SundaeSwap hereby demands a jury trial

Dated: November 1, 2022        /s/ *Eric Martin*
                                   Eric Martin

**BRYAN CAVE LEIGHTON PAISNER LLP**
Eric Martin
Meryl Macklin
Helen C. Goodman
Sasha D. Riedisser

*Attorneys for Counterclaimant*